**Nos. 06-3909, 07-3106**

_____
_____

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**CLARENCE REMBLE and CAESAR ANDERSON,**

**Defendants-Appellants**

_____

**On Appeal From The United States District Court
For The Southern District Of Ohio**

_____

**PROOF BRIEF OF THE UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE**

_____

**GREGORY G. LOCKHART**
**United States Attorney**

**KENNETH L. PARKER**
**Assistant U.S. Attorney**
**221 East Fourth Street, Suite 400**
**Cincinnati, Ohio  45202**
**(513) 684-3711**

_____
_____

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . .  v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

ISSUES PRESENTED  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

SUMMARY OF ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

      I     THE COURT'S DENIAL OF DEFENDANT REMBLE'S MOTION
            TO SUPPRESS THE EVIDENCE SEIZED FROM HIS RESIDENCE
            ON WEST RAYMOND STREET IN COMPTON, CALIFORNIA
            WAS PROPER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      II.    DEFENDANT'S REMBLE'S DUE PROCESS RIGHTS
            WERE NOT VIOLATED BY THE ADMISSION OF
            THE PHOTOGRAPHS BECAUSE THEY WERE
            HIGHLY PROBATIVE TO SHOW THAT THERE
            WERE LARGE SUMS OF MONEY IN THE
            CONSPIRACY, THAT THE LOCATION WHERE THE
            MONEY WAS PHOTOGRAPHED WAS IN HIS
            RESIDENCE, AND THAT THE PERSON TAKING
            THE PHOTOGRAPH WAS IN THE PRESENCE OF
            REMBLE'S FAMILY MEMBER.  THUS, THE
            PHOTOGRAPHS SERVED TO SUPPORT THE
            ADDITIONAL EVIDENCE PRESENTED IN THIS

i

CASE THAT REMBLE WAS INVOLVED IN THE
CONSPIRACY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

III. THE DISTRICT COURT'S ADMISSION OF
REFERENCES TO THE DODGE CITY CRIPS, WAS
PROPER BECAUSE IT SHOWED THE INTER-
RELATIONSHIPS BETWEEN CO-CONSPIRATORS
AND BECAUSE THE GANG DID NOT BECOME
THE FOCUS OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

IV. THE DISTRICT COURT PROPERLY ADMITTED TESTIMONY
CONCERNING DEFENDANT REMBLE'S INTIMIDATION OF
ANOTHER CO-DEFENDANT WHILE THEY WERE HOUSED AT
THE GRANT COUNTY, KENTUCKY JAIL. . . . . . . . . . . . . . . . . 51

V. THE DISTRICT COURT'S SENTENCE OF
DEFENDANT REMBLE WAS REASONABLE. . . . . . . . . . . . . . 55

VI. THE DISTRICT COURT'S SENTENCE OF
DEFENDANT ANDERSON WAS APPROPRIATE. . . . . . . . . . . 58

VII. DEFENDANT ANDERSON'S CLAIM THAT HIS ATTORNEY
WAS INEFFECTIVE SHOULD NOT BE HEARD ON THIS
DIRECT APPEAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

APPELLEE'S CROSS-DESIGNATION OF
APPENDIX CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

# <u>TABLE OF AUTHORITIES</u>

<u>CASES:</u>                                                    <u>PAGE(S)</u>

<u>Aguilar v. Texas</u>, 378 U.S. 108 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

<u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 60

<u>Clark v. Martinez</u>, 543 U.S. 371, 378 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . 60

<u>Freeman v. Francis</u>, 196 F.3d 641, 643 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 60

<u>General Elec. Co. v. Joiner</u>, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . 51

<u>Illinois v. Gates</u>, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

<u>Nathanson v. United States</u>, 290 U.S. 41 (1933) . . . . . . . . . . . . . . . . . . . . . . . . 38

<u>United States v. Blackwell</u>, 459 F.3d 739, 772 (6th Cir. 2006) . . . . . . . . . . . . . . 63

<u>United States v. Bonds</u>, 12 F.3d 540, 554 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . 54

<u>United States v. Brown</u>, 367 F.3d 549 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . 43, 47

<u>United States v. Caicedo</u>, 85 F.3d 1184 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . 42

<u>United States v. Canan</u>, 48 F.3d 954 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . 40

<u>United States v. City of Warren</u>, 138 F.3d 1083 (6th Cir. 1998) . . . . . . . . . . . . . 43

<u>United States v. Colon-Solis</u>, 354 F.3d 101 (1st Cir. 2005) . . . . . . . . . . . . . . 58-63

<u>United States v. Franks</u>, 511 F.2d 25 (6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . 53

<u>United States v. Gibney</u>, 519 F.3d 301 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . 61

<u>United States v. Gonzalez</u>, 501 F.3D 630, 644 (6th Cir. 2007) . . . . . . . . . . . . . . . 64

iii

United States v. Henson, 848 F.2d 1374 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . 40

United States v. Harris, 403 U.S. 573 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

United States v. Jenkins, 313 F.3d 549 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . 46

United States v. Jinadu, 98 F.3d 239 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . 60, 61

United States v. Johnson, 28 F.3d 1487 (8th Cir. 1994) . . . . . . . . . . . . . . . . 48, 50

United States v. Jones, 542 F.2d 661 (6th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . 60

United States v. Leon, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

United States v. Lewis, 910 F.2d 1367 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . 48

United States v. Marquina, 172 F.3d 874, 1999 WL 55281, at *1, *3
(Jan. 12, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

United States v. Ortiz-Torres, 449 F.3d 61, 73 (1st Cir 2006) . . . . . . . . . . . . . . . 64

United States v. Mendez-Ortiz, 810 F.2d 76 (6th Cir. 1986) . . . . . . . . . . . . . 53, 54

United States v. Sassanelli, 118 F.3d 495 (6th Cir. 1999) . . . . . . . . . . . . . . . . . 43

United States v. Sparks, 949 F.2d 1023 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . 48

United States v. Streat, 22 F.3d 109 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . 57

United States v. Swiney, 203 F.3d 397 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . 60, 61

United States v. Vonner, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) . . . . . . . . 58

United States v. Williams, 962 F.2d 1218 (6th Cir.),
cert. denied, 506 U.S. 892 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## STATUTES, RULES, AND REGULATIONS:

18 U.S.C. § 3231 ............................................................. 1

18 U.S.C. § 3742 ............................................................. 1

18 U.S.C. § 3553 ....................................................... 54, 64

21 U.S.C. § 841(b)(1)(A) ............................................... 57, 58

21 U.S.C. § 846 ............................................ 3, 22, 32, 57, 59, 60

§ 2255 ...................................................................... 66

28 U.S.C. § 1291 ............................................................ 1

Fed. R. App. P. 32(a)(7) ................................................... 67

Fed. R. App. P. 32(a)(7)(c)(I) ............................................. 67

Fed. R. Crim. P. 404(b) .................................................... 52

Sixth Circuit Rule 30(b) ................................................... 68

Rule 4(b) of the Federal Rules of Appellate Procedure ..................... 1

U.S.S.G. § 2D1.1 (2005 ed.) ............................................... 59

## STATEMENT REGARDING ORAL ARGUMENT

The United States submits that oral argument is not necessary in this case because there are no complex factual issues that the Court needs to address.

## <u>STATEMENT OF JURISDICTION</u>

The United States District Court had jurisdiction over this matter pursuant to Title 18 U.S.C. § 3231.  Caesar Anderson and Clarence Remble filed timely Notices of Appeal on June 22, 2006 and January 19, 2007 of the district court's judgment and sentencing orders.

The Sixth Circuit Court of Appeals has jurisdiction over their appeals pursuant to Title 18 U.S.C. § 3742, 28 U.S.C. § 1291 and Rule 4(b) of the Federal Rules of Appellate Procedure.

## <u>ISSUES PRESENTED</u>

I.    WHETHER THE DISTRICT COURT PROPERLY DENIED DEFENDANT REMBLE'S MOTION TO SUPPRESS THE EVIDENCE SEIZE FROM HIS RESIDENCE ON WEST RAYMOND STREET, COMPTON, CALIFORNIA.

II.    WHETHER THE PHOTOGRAPHS OF YOUNG MEN HOLDING LARGE SUMS OF U.S. CURRENCY IN THE KITCHEN OF DEFENDANT REMBLE'S WEST RAYMOND STREET, COMPTON, CALIFORNIA RESIDENCE WERE PROBATIVE TO THE CASE.

III.    WHETHER THE DISTRICT COURT PROPERLY ADMITTED THE REFERENCES TO THE DODGE CITY CRIPS GANG.

IV.    WHETHER THE DISTRICT COURT'S ADMISSION OF THE TESTIMONY REGARDING DEFENDANT REMBLE'S INTIMIDATION OF A WITNESS DURING THE TIME PERIOD THEY WERE HOUSED TOGETHER BEFORE TRIAL WAS PROPER.

V.    WHETHER THE DISTRICT COURT'S SENTENCE OF DEFENDANT REMBLE WAS REASONABLE.

VI.    WHETHER THE DISTRICT COURT'S SENTENCE OF DEFENDANT ANDERSON WAS APPROPRIATE.

VII.    WHETHER DEFENDANT ANDERSON'S CLAIM THAT HIS ATTORNEY WAS INEFFECTIVE IN HIS REPRESENTATION OF HIM SHOULD BE HEAD ON THIS DIRECT APPEAL.

## STATEMENT OF THE CASE

This is an appeal from the district court's sentences of Caesar Anderson and Clarence Remble.

On January 18, 2006, Anderson entered a plea to Count 1 of a superseding indictment, charging him with conspiring to distribute and possessing with intent to distribute in excess of 50 grams of methamphetamine, in excess of 50 grams of cocaine base, in excess of 500 grams of cocaine, and an amount of marijuana in violation of Title 21 U.S.C. § 846. (Plea Agreement: R. 310, Apx. at xx). On June 21, 2006, after reviewing the Presentence Report (hereinafter "PSR"), the district court sentenced Anderson to a term of 120 months imprisonment. (R. 396: Judgment, Apx. at xx). The district court ordered Anderson to pay a $1,000 fine, imposed a five year term of supervised release, and pay a one hundred dollar special assessment. (R. 396: Judgment, Apx. at xx). Anderson filed a timely Notice of Appeal on June 22, 2006. (R. 399: Notice of Appeal, Apx. at xx).

Remble chose to go to trial and, on July 5, 2006, a jury concluded beyond a reasonable doubt that Remble was guilty of conspiracy to possess with intent to distribute in excess of 50 grams of methamphetamine, in excess of 50 grams of cocaine base ("crack"), in excess of 500 grams of cocaine, and an amount of marijuana in violation of Title 21 U.S.C. § 846. (R. 410: Verdict, Apx. at xx). On

3

July 6, 2006, the jury also determined that Remble's residence located at 469West
Raymond Street, Compton, California 90220 should be forfeited to the United
States.  (R. 414: Verdict, Apx. at xx).

On January 18, 2007, after reviewing the motions filed by Remble and the
United States, as well as the PSR, the district court sentenced Remble to a term of
life imprisonment.  (R. 609: Judgment, Apx. at xx).  Also, the district court ordered
Remble to pay a $100,000 fine, imposed a five year term of supervised release, and
pay a one hundred dollar special assessment.  (R. 609: Judgment, Apx. at xx).
Remble filed a timely Notice of Appeal on January 19, 2007.  (R. 611: Notice of
Appeal, Apx. at xx).

## STATEMENT OF THE FACTS

**1.      Setting Up Narcotic Bases In Zanesville.**

In 2000, Earl Owens began traveling from California to Zanesville, Ohio (hereinafter "Zanesville") to sell crack.  (R. 584:  Tr. Vol. 2 at 126, Apx. at xx). Owens made more money selling crack than cocaine. (R. 584:  Tr. Vol. 2 at 135, Apx. at xx).  Eventually, Owens and his friend of twenty years, Clarence Remble, began setting up a joint operation in Ohio whereby Remble would send Owens narcotics from California.  (R. 584:  Tr. Vol. 2 at 129 & 133, Apx. at xx).  Owens would process the cocaine into cocain base (hereinafter "crack") for resell.  (R. 584:  Tr. Vol. 2 131 & 134, Apx. at xx).

Owens and Remble agreed to split the profits, liabilities, and debts of all of the narcotics sales 50-50.  (R. 584:  Tr. Vol. 2 at 137 & 144, Apx. at xx).  They discussed their trafficking operation daily.  (R. 585:  Tr. Vol. 4 at 104 & 6-7, Apx. at xx).

**Jaime Covington**

Jaime Covington was from California and had been dealing drugs most of his life.  (R. 426: 6/12/06  Tr. at 42 & 69, Apx. at xx).  At the time that Covington met Remble, Covington was selling cocaine and crack on the streets in California.

(R. 426: 6/12/06  Tr. at 43, Apx. at xx).  In November of 2004, Remble began

supplying Covington with crack in ounce quantities for further distribution.  (R.

426: 6/12/06  Tr. at 49 & 51, Apx. at xx).

In December of 2004, Remble approached Covington about traveling to

Zanesville to make money "selling crack."  (R. 426: 6/12/06 Tr. at 54-55, Apx. at

xx).  At that time, Covington had heard Remble referred to as "Smoke," but in

Zanesville, Covington would come to hear him called "The General."  (R. 426:

6/12/06  Tr. at 45, Apx. at xx).

In January, Covington traveled to Zanesville by bus and met Owens and Jeff

Remble for the first time. (R. 426: 6/12/06  Tr. at 55-56, Apx. at xx).  Owens set

Covington up with a location to distribute narcotics and provided him with a half

ounce of crack to sell. (R. 426: 6/12/06 Tr. at 56-57, Apx. at xx).  Covington began

to generate up to $2,000 per day distributing crack. (R. 426: 6/12/06  Tr. at 59,

Apx. at xx).

Within two days after Covington arrived in Zanesville, Remble came to the

apartment where he was staying and asked him how he was doing "making money"

from selling drugs.  (R. 426: 6/12/06  Tr. at 61, Apx. at xx).  During his testimony,

Covington made it clear his sole purpose in Zanesville was to deal crack and with

Remble he knew there was nothing to hide about that fact. (R. 426: 6/12/06  Tr. at

62, Apx. at xx).


**Antwain Atkins**

At the time his friend approached him about traveling by bus to Zanesville

for the purpose of selling drugs, Antwain Atkins was a 19-year-old young man

living in Los Angeles, California and had never sold narcotics.  (R. 426: 6/12/06

Tr. at 5-7, Apx. at xx).  Atkins agreed to go to Zanesville and when he arrived,

Owens and Anderson picked him up from the bus station and took him to an

apartment located at 1183 Wheeling Avenue.  (R. 426: 6/12/06 Tr. at 7, Apx. at

xx).  The next day, Owens gave Atkins crack to sell. (R. 426: 6/12/06 Tr. at 9, Apx.

at xx).  Atkins and Anderson lived at the Wheeling address selling crack daily. (R.

426: 6/12/06 Tr. at 10-12, Apx. at xx).  While in living at the Wheeling address,

Atkins also came to know Derrick Braggs, who he referred to as "Bam";

Covington;  and Jeff Remble.  (R. 585: 6/12/06 Tr. at 15-16, Apx. at xx).  Atkins

would later meet Remble who Atkins knew as "Smoke."  (R. 426: 6/12/06 Tr. at 8,

Apx. at xx).

A month or so after Atkins arrived, Remble approached him to discuss the

do's and don't's to selling drugs. (R. 426: 6/12/06 Tr. at 7-9, Apx. at xx).  On one

occasion, Remble approached Atkins at the Wheeling residence to front Atkins a half ounce of crack for resell. (R. 426: 6/12/06 Tr. at 13, Apx. at xx).  On another occasion, Remble approached Atkins about selling methamphetamine. (R. 426: 6/12/06 Tr. at 14, Apx. at xx).  Remble also told Atkins that there was "a lot of money to be made in Middletown, Ohio (hereinafter "Middletown") as far as selling drugs. (R. 426: 6/12/06 Tr. at 16, Apx. at xx).

**Suspicious Packages**

On October 31, 2003 and January 27, 2004, law enforcement authorities in Zanesville, Ohio intercepted two suspicious packages containing large amounts of U.S. currency bundled with black rubber bands that were being sent from Zanesville to California.  (R. 584:  Tr. Vol. 2 at 37- 41, 55-56 & 62, Apx. at xx). Officers identified Owens as the sender of the packages.  (R. 584:  Tr. Vol. 2  at 64 & 69; 4 at 45, Apx. at xx).  Officers also determined that other packages and money orders had been sent by Owens and/or other members of the organization from Zanesville to various individuals, including Clarence Remble, Maurnisha Cobene, Derrick Braggs, and Marquis Remble, at two distinct locations: 469 West Raymond Street and 1402 West 163rd Street, Compton, California. (R. 585:  Tr. Vol. 4 at 44, Apx. at xx).

8

2.    **The Middletown Expansion**

In November of 2004, Remble expanded the operation to Middletown when

he began supplying John Wayne Jones, a known drug dealer, with crack, xanax,

and methamphetamine.  (R. 564:  Tr. Vol. 6 at 136, Apx. at xx).  Jones called

Remble  "The General" or "Smoke."  (Id., Apx. at xx).  Jones' relationship with

Remble grew to the point that Jones not only relied on Remble for drugs to

distribute, but also for assistance in hiring an attorney when Jones was in trouble

with the law.  (R. 564:  Tr. Vol. 6 at 154, Apx. at xx).

Remble also sold methamphetamine and cocaine to Justin Lawson, John

Cassanova, CJ Roland Martin, John Woodward, and Adonia Hogsten for personal

use and for further distribution between themselves and throughout Middletown.

(R. 564:  Tr. Vol. 6 at 76-82; 8 at 57-62 & 67-69 & 71, Apx. at xx).  When Remble

could not come to Middletown to distribute narcotics or pick up money, he had

people either travel to Zanesville to meet with Owens, (R. 564:  Tr. Vol. 6 at 83-

86; R. 566:  Tr. Vol. 8 at 72, Apx. at xx), or had the narcotics or currency delivered

or picked up by Carrie Evans, Kristen Richards, Joya Caldwell or others.  (R. 564:

Tr. Vol. 6 at 88-89, Apx. at xx; R. 565:  Tr. Vol. 7 at 88, Apx. at xx; R. 566:  Tr.

Vol. 8 at 65 & 72; and R. 567:  Tr. Vol. 9 at 71, 96-98, 103-106, Apx. at xx).

9

## Adonia Hogsten

Adonia Hogsten first met Remble when Justin Lawson brought him to her home in Middletown in February of 2005.  (R. 564:  Tr. Vol. 6 at 85-86, Apx. at xx).  Remble was introduced as "The General."  (Tr. 6 at 85, Apx. at xx).  At the time, Hogsten would steal clothes to support her cocaine and methamphetamine addiction.  (R. 564:  Tr. Vol. 6 at 86-87, Apx. at xx).  One day, Remble asked Hogsten if Braggs and Evans could stay at her home in Middletown in return for cocaine.  (R. 564:  Tr. Vol. 6 at 88-90, Apx. at xx).  (R. 564:  Tr. Vol. 6 at 91, Apx. at xx).  On one occasion, Remble asked Hogsten if he could keep a truck at her home, to which she agreed.  (R. 564:  Tr. Vol. 6 at 95, Apx. at xx).

Hogsten became aware that her home was being used to traffic drugs.  (R. 564:  Tr. Vol. 6  at 94, Apx. at xx).  On various occasions, Hogsten saw Jeff Remble with cocaine in her home, "The General" (Remble) with a duffle bag containing cocaine, and Braggs conduct a narcotics transaction.  (R. 564:  Tr. Vol. 6 at 93-94 & 103, Apx. at xx).  When she asked the group not to sell drugs out of her home, their response was "If you need to go somewhere, go somewhere."  (R. 564:  Tr. Vol. 6 at 94, Apx. at xx).  So the situation continued with, what appeared to Hogsten, as Remble being the "boss."  (R. 564:  Tr. Vol. 6 at 96, Apx. at xx).

**Jonathan Cassanova**

Justin Lawson introduced Remble to Jonathan Cassanova as "The General" as well. (R. 564: Tr. Vol. 6 at 53, Apx. at xx). The purpose of the meeting was for Cassanova to start getting methamphetamine from Remble because he supposedly had a better quality of methamphetamine than Cassanova was getting from a different source. (R. 564: Tr. Vol. 6 at 54, Apx. at xx). Although reluctant at first, Cassanova considered Remble's methamphetamine "excellent," in fact he knew it to be "ice," and began traveling to Hogsten's house or other locations to get it. (R. 564: Tr. Vol. 6 at 57-58, Apx. at xx). During the time period he dealt with Remble, Cassanova came to know that Remble and Braggs were connected and heard that the organization had ties to Zanesville. (R. 564: Tr. Vol. 6 at 72-73, Apx. at xx).

**CJ Roland Martin**

By the time he was 21 years of age, CJ Roland Martin had already established himself as a narcotics dealer. (R. 400: Tr. Vol. 8 at 56, Apx. at xx). The persons he credited for assisting him in building his drug dealing resume were Lawson, Woodward, and Remble, who Martin knew only as "The General." (R. 400: Tr. Vol. 8 at 56, Apx. at xx). Remble would use Woodward, Richards,

11

Evans, Caldwell, and Lawson to get methamphetamine to Martin. (R. 400: Tr. Vol. 8 at 57, 61 & 65, Apx. at xx). Caldwell brought Martin methamphetamine at Remble's direction about once a week. (R. 400: Tr. Vol. 8 at 72, Apx. at xx). Martin knew the methamphetamine was high quality "ice." (R. 400: Tr. Vol. 8 at 63, Apx. at xx). All Martin had to do was contact Remble to set up the transactions – a contact Martin made through his cellular phone with Remble's number listed only as "Secret." (R. 400: Tr. Vol. 8 at 73, Apx. at xx).

**John Woodward**

Although working as a self-employed home improvement specialist, John Woodward could not shake his four-year addiction to methamphetamine. (R. 394: Tr. Vol. 7 at 72 & 74, Apx. at xx). Woodward came to meet Remble, who he knew only as "The General," when he was looking for methamphetamine. (R. 394: Tr. Vol. 7 at 75-76, Apx. at xx). On the first occasion, Woodward purchased a quarter-ounce of methamphetamine from Remble, (R. 394: Tr. Vol. 7 at 76, Apx. at xx), but then started getting eight balls fronted to him by Remble on a regular basis. (R. 394: Tr. Vol. 7 at 78, Apx. at xx). From time to time, Woodward would pair up with Lawson to meet Remble and get cocaine or methamphetamine. (R. 394: Tr. Vol. 7 at 82-83, Apx. at xx). Once, Woodward and Lawson traveled to

12

Zanesville to get methamphetamine from Remble, but when they got there Remble

directed them to meet Owens to get the narcotics. (R. 394: Tr. Vol. 7 at 84-86,

Apx. at xx). Woodward testified that Remble's methamphetamine was "the best

stuff [he had] ever dealt – it was "ice." (R. 564: Tr. Vol. 6 at 90; 8 at 62-63, Apx.

at xx).


**3.     The Female Links**

**<u>Janet Alexander:  Owens' Girl</u>**

Janet Alexander met Owens through a drug connection in February of 2005.

(R. 585: Tr. Vol. 4 at 92, Apx. at xx). She was a resident of Zanesville and sought

out Owens for the purpose of getting crack to sell. (R. 585: Tr. Vol. 4 at 92-93,

Apx. at xx). Eventually, Owens would not only supply Alexander with crack, he

also began dating her a short time later which caused him to begin to spend a lot of

time at Alexander's home. (R. 585: Tr. Vol. 4 at 93 & 100-101, Apx. at xx).

Owens kept crack, cocaine, marijuana and large amounts of currency at

Alexander's residence. (R. 585: Tr. Vol. 4 at 103-104 & 107; 6 at 14, Apx. at xx).

On one occasion, Owens brought in a large 11-ounce cookie-size chunk of crack

and had Alexander cut it up for distribution. (R. 585: Tr. Vol. 4 at 102, Apx. at

xx).  Owens also used Alexander to mail packages of a money and money orders to California.  (R. 585:  Tr. Vol. 4 at 108-109; 6 at 9-10, Apx. at xx).

Whenever Owens was at her home, Alexander was able to observe and hear Owens discuss the narcotics operation with Remble.  (R. 585:  Tr. Vol. 4 at 94-95, Apx. at xx).  Alexander testified that Owens and Remble would discuss the "ticket" or "dollar figures."  (R. 585:  Tr. Vol. 4 at 94 & 104-105, Apx. at xx).  Alexander knew they were close and felt Owens talked to Remble constantly about the operations.  (R. 564:  Tr. Vol. 6 at 7, Apx. at xx).  Alexander never met Remble and only knew him as "Smoke," that he lived in California, grew up with Owens, had a son named Marquis, and was Owens "partner." (R. 585:  Tr. Vol. 4 at 95; 6 at 7 & 40 , Apx. at xx).

Although Alexander had her own customer base for crack in Cambridge, Ohio, Owens told her to quit dealing with them.  (R. 585:  Tr. Vol. 4 at 96 & 110; 6 at 13, Apx. at xx.)  He gave her new customers and introduced her to new people. (Tr. 4 at 110, Apx. at xx).  Through Alexander's assistance, the Remble-Owen drug trafficking operation expanded into Coshocton, Ohio.  (R. 564:  Tr. Vol. 6 at 18, Apx. at xx).  Alexander testified that "[m]ore young men in their 20's from California would travel to Coshocton, Ohio for the purpose of selling drugs.  (R. 564:  Tr. Vol. 6 at 18-19, Apx. at xx).

14

**<u>Kristen Richards':  Jeff Remble's Girl</u>**

Kristen Richards was from Middletown, but one day found herself along with Carrie Evans in a hotel room in Zanesville meeting with Owens, who she knew as "Eightball," for the purpose of picking up ten baggies of methamphetamine from him.  (R. 394:  Tr. Vol. 7 at 154-155, Apx. at xx).  Her and Evans' sole purpose in the organization was to either take drugs or money back and forth between Middletown and Zanesville or rent an apartment to receive shipments of narcotics.  (R. 394:  Tr. Vol. 7 at 155, 159-60 & 164-66, Apx. at xx).

Eventually, Richards found herself making three to five trips a week from Middletown to Zanesville for the organization.  (R. 394:  Tr. Vol. 7 at 173, Apx. at xx).  Richard knew Remble only as "The General" and "Smoke."  (R. 394:  Tr. Vol. 7 at 156, Apx. at xx).  Remble also instructed her and Evans to rent an apartment on El Camino Drive in Middletown for the purpose of receiving packages containing narcotics. (R. 394:  Tr. Vol. 7 at 166-72, Apx. at xx).  Richards began dating Jeff Remble and learned the inner-workings of the organization.  (R. 394:  Tr. Vol. 7 at 157 & 162, Apx. at xx).  Richards testified that she would overhear Evans and Jeff Remble talk about the gang the "Dodge City Crips" and heard that Jeff Remble, "Eightball" (Owens), "Smoke" (Clarence Remble), and "Bam" (Braggs) were members of the gang.  (R. 394:  Tr. Vol. 7 at

158 & 175, Apx. at xx).  Also, Richards  testified that they talked about her getting

initiated into the gang, but to do so she had to have sex with Owens and Remble.

(R. 394:  Tr. Vol. 7 at 176, Apx. at xx).  In order to keep her status and good grace

with her boyfriend, Jeff Remble, she agreed to do so.  (R. 394:  Tr. Vol. 7 at 176,

Apx. at xx).  In fact, Richards subsequently told Jeff about her sexual encounter.

(R. 394:  Tr. Vol. 7 at 181, Apx. at xx).


**4.    Lead Like A "General," But Be As Cloudy As "Smoke"**

Although the Remble and Owens continued to set up various distribution

cells in Zanesville and Middletown, their true identities remained unknown to all

except the closest associates.  As noted, most of the people involved knew Remble

only as "The General" or "Smoke."  (R. 566: 6/12/06  Tr. at 8, Apx. at xx (Atkins);

6/12/06 Tr. at 45, Apx. at xx (Covington); R. 585:  Tr. Vol. 4 at 95, Apx. at xx

(Alexander); R. 564:  Tr. Vol. 6 at 53, Apx. at xx (Cassanova); R. 564:  Tr. Vol. 6

at 85, Apx. at xx (Hogsten); R. 564:  Tr. Vol. 6 at 136, Apx. at xx (Jones'); R. 394:

Tr. Vol. 7 at 75, Apx. at xx (Woodward); R. 394:  Tr. Tr. 7 at 156, Apx. at xx

(Richards); R. 400:  Tr. Vol. 8 at 56, Apx. at xx (Martin); and R. 401:  Tr. 9 at 70-

71, Apx. at xx (Caldwell).  Owens, who used various aliases such as "Chris

Owens," was known to most as simply "Eightball."

16

Most members of the conspiracy could only contact them through their cellular phones.  Over twenty cellular phones were seized from Remble's West Raymond Street residence alone.  (R. 584:  Tr. Vol. 2 at 16-18, Apx. at xx).  Martin even kept Remble's number in his cellular phone under "Secret."  (R. 566:  Tr. Vol. 8 at 64 & 76, Apx. at xx).  Caldwell testified as to how she talked to Remble off and on during the early period of the conspiracy, but as time went on she lost her ability to even contact him.  (R. 567  Tr. Vol. 9 at 78, Apx. at xx).

**5.    Cracks In The Glass**

On September 25, 2004, Ohio State Patrolman, Jacob Pyles, stopped a vehicle traveling eastbound on Interstate 70.  (R. 584:  Tr. Vol. 2 at 88, Apx. at xx).  During the stop, Patrolman Pyles determined that the driver of the vehicle was Derrick Braggs and the passenger was Remble.  (R. 584:  Tr. Vol. 2 at 88, Apx. at xx).  Patrolman Pyles noticed a number of inconsistencies in Braggs' and Remble's stories about their travel from California to Ohio.  (R. 584:  Tr. Vol. 2 at 91, Apx. at xx).  When asked, Remble produced an State of Ohio driver's license identifying his residential address as 731 Homewood Avenue, Zanesville, Ohio. (R. 584:  Tr. Vol. 2 at 96, Apx. at xx).  Later, it would be determined that Remble never lived at the Homewood Avenue address.  (R. 584:  Tr. Vol. 2 at 91, Apx. at xx).  Braggs

17

produced a State of California driver's license listing his residential address as 1402 West 163rd Street, Compton, California. (R. 584: Tr. Vol. 2 at 96 & 100, Apx. at xx). During the stop, Patrolman Pyles discovered four kilograms of cocaine inside the vehicle and arrested both men. (R. 584: Tr. Vol. 2 at 95, Apx. at xx). Braggs would later plead guilty to possessing the cocaine and the charges against Remble were dismissed. (R. 584: Tr. Vol. 2 at 103 & 113, Apx. at xx).

On March 24, 2005, Muskingum County Sheriff Patrolman, Ryan Williams, arrested Jaime Covington after he discovered he Covington was in possession of crack during a routine traffic stop. (R. 585: Tr. Vol. 4 at 33-37, Apx. at xx). Not long after Covington's arrest, Officer Kanavel was contacted by the manager of a motel in Zanesville and informed of a suspicious woman that came to the motel and demanded the belongings from one of the rooms. (R. 584: Tr. Vol. 2 at 72, Apx. at xx). The woman was Janet Alexander. (R. 584: Tr. Vol. 2 at 74, Apx. at xx). Instead of turning the items over to Alexander, the motel manager collected the belongings and gave them to Officer Kanavel when he arrived. Also, the manager informed Officer Kanavel that the room was being rented by Covington. (R. 584: Tr. Vol. 2 at 74, Apx. at xx). In the items, law enforcement officers discovered an amount of crack and two identification cards belonging to Covington. (R. 584: Tr. Vol. 2 at 74 & 77, Apx. at xx). One was a State of

18

California identification card and the other was for the State of Ohio and listed an address of 1183 Wheeling Avenue, Zanesville, Ohio. (R. 584: Tr. Vol. 2 at 77, Apx. at xx).

At the time of his arrest, Covington indicated that he would not cooperate with law enforcement in his case. He also attempted to use an alias. (R. 585: Tr. Vol. 4 at 33 & 36, Apx. at xx). All of that was to no avail as law enforcement officers positively identified him. (R. 585: Tr. Vol. 4 at 37, Apx. at xx).

Atkins was also arrested for dealing drugs. At the time of his arrest, Atkins remembered what Remble told him to do if he ever got caught and that was "to never say nothing [sic] to authorities..." and "don't cooperate, period." (R. 566: 6/12/06 Tr. at 19-20, Apx. at xx). When Atkins was charged federally and housed at the Grant County, Kentucky jail, he testified that he attempted to stay away from Remble (who also came to be housed there after his arrest). (R. 426: 6/12/06 Tr. at 21, Apx. at xx). Atkins testified that Anderson persuaded him to attend church sessions at the facility and, during those periods, Remble would pull Atkins to the side to discuss the case. (R. 426: 6/12/06 Tr. at 22-26, Apx. at xx). Atkins testified that Remble told him on at least two occasions "just don't testify against him and everything will be taken care of" meaning that Remble would put money on his books while he was incarcerated. (R. 426: 6/12/06 Tr. at 24, Apx. at xx).

19

In Middletown, Jones would also have run-ins with the law while he was distributing narcotics. Immediately after he was jailed, Jones would contact his girlfriend, Nicole Adams, and advise her to call Remble to get him out. (R. 564: Tr. Vol. 6 at 137-38, 142 &150, Apx. at xx). On one occasion, Remble traveled to Adam's home in Middletown unannounced and upset and told her that "[they] were making [him] lose out on money." (R. 564: Tr. Vol. 6 at 146, Apx. at xx). Nevertheless, Remble did hire attorney Greg Shell to represent Jones after one arrest. (R. 564: Tr. Vol. 6 at 154, Apx. at xx).

The operation took another hit when law enforcement officers executed a search warrant at Hogsten's home in Middletown. (R. 564: Tr. Vol. 6 at 96, Apx. at xx). Hogsten, Jeff Remble and Evans were arrested after officers seized digital scales and an amount of methamphetamine secreted inside the truck Remble had requested to keep on the property. (R. 564: Tr. Vol. 6 at 97; 9 at 25-26, Apx. at xx). Only Hogsten and Evans were released. (R. 564: Tr. Vol. 6 at 97, Apx. at xx). Remble would give the order to get Evans out of jail. (R. 565: Tr. Vol. 7 at 165-66, Apx. at xx). Later, Richards and Evans visited Jeff Remble frequently to relay messages between him and Clarence Remble. (R. 565: Tr. Vol. 7 at 182-83, Apx. at xx).

20

Another crack in the glass of the operation occurred when law enforcement officers searched the apartment rented by Richards and Evans on El Camino Drive in Middletown. (R. 567: Tr. Vol. 9 at 31, Apx. at xx). Inside the apartment, officers seized boarding pass receipts listed with Braggs' name; Middletown Police Department paperwork for Jeff Remble; numerous baggies, and, miscellaneous papers instructing the reader to "Copy Carrie's ID – 170 money order – go to the courthouse and pay her ticket, and call D-Man back." (R. 567: Tr. Vol. 9 at 34-, Apx. at xx). Officers determined that the reference to "D-man" on the slip of paper was code for "Remble." (R. 565: Tr. Vol. 7 at 181, Apx. at xx).

Owens would have his share of trouble with law enforcement as well. On June 10, 2005, officers of the Columbus Police Department intercepted a package that contained ten pounds of marijuana and a kilogram of cocaine. (R. 565: Tr. Vol. 7 at 131, Apx. at xx). The officers decided to conduct a controlled delivery of the package. (R. 565: Tr. Vol. 7 at 139, Apx. at xx). During that time, officers observed and identified Owens in the area driving back and forth while attempting to take receipt of the package. R. 565: Tr. Vol. 7 at 140-143, Apx. at xx). Owens was stopped and determined to be driving without a valid driver's license and arrested for that violation. (R. 565  Tr. Vol. 7 at 143, Apx. at xx). At the time of

his arrest, Owens was on the phone with Remble and informed him that the police were taking him to jail. (R. 584:  Tr. Vol. 2 at 140, Apx. at xx).

On July 21, 2005, a federal grand jury issued a sealed indictment against Remble, Owens, Jeff Remble, Anderson, Covington, Atkins, Jones, Caldwell, Hogsten, Lawson, Richards, Woodward, Cassanova, Evans, Martin, Alexander, Jacory Holt, Jeffrey Carter, Darnell Mitchell, and Ellie Paula Jones, for, inter alia, conspiracy to possess with intent to distribute in excess of 50 grams of methamphetamine; in excess of 50 grams of crack; in excess of 500 grams of cocaine; and an amount of marijuana, in violation of 21 U.S.C. § 846. (R. 213: Superseding Indictment,  Apx. at xx).


**6.      The Search Warrant: A Culmination Of Collected Dots**

On July 26, 2005, Federal Bureau of Investigations Special Agent, Peter Lakes, sought a warrant to search the residence at 469 West Raymond Street, Compton, California. (R. 336: Response,  Apx. at xx).  In his affidavit to the warrant, Agent Lakes averred to the following:  (1) the information was based on his personal knowledge and received from numerous other law enforcement resources in Ohio and California; (2) some of the information was received from a number of confidential sources; (3) at least one of the confidential source also

22

incriminated him/herself in the criminal activities of the organization; (4) some members of the organization were identified as members of the organization the Dodge City Crips; (5) the organization was responsible for establishing a number of drug trafficking cells in the Zanesville, Middletown, and Coshocton, Ohio areas whose primary purpose was to import and distribute crack, cocaine, methamphetamine, marijuana, and other illegal narcotics while utilizing the commercial postal services to return the drug proceeds to their cohorts in California; (5) the investigation determined that Clarence Remble, Earl Owens, and Maurnisha Cobene were integral parts of enterprise; (6) two of the addresses in California that were identified were 469 West Raymond Street, Compton, California and 1402 West 163rd Street, Compton, California, to which Remble had a connection to both; (7) fellow officers in California advised that there appeared to be drug trafficking activity occurring at the West 163rd Street address; and (8) that on July 21, 2005, Remble and a number of other members and associates of the Crips organization were indicted by a federal grand jury in the Southern District of Ohio. (R. 336-2: Repsonse at 9-29, Apx. at xx).

Taking into account the totality of the circumstances as presented in the affidavit and finding that there was probable cause, Central District of California Magistrate Judge Paul Game, Jr. issued a search warrant for the 469 West

Raymond Street, Compton, California, address on July 26, 2005. (R. 336, Response, Apx. at xx).

**7.    The General Loses His Base**

On July 27, 2005, law enforcement officers executed the search warrant at 469 West Raymond Street, Compton, California.  During the search, the officers seized, <u>inter alia</u>, numerous postal money order receipts,  (R. 584:  Tr. Vol. 2 at 6, Apx. at xx); food sealer packaging devices and numerous bags and rolls of tape, (R. 584:  Tr. Vol. 2 at 7& 9, Apx. at xx); large and small baggies, (R. 584:  Tr. Vol. 2 at 9, Apx. at xx); plastic bindles, (R. 584:  Tr. Vol. 2 at 10, Apx. at xx); a large amount of black rubber bands, (R. 584:  Tr. Vol. 2 at 11, Apx. at xx); scales, (R. 584:  Tr. Vol. 2 at 11-12, Apx. at xx); numerous plastic vials, (R. 584:  Tr. Vol. 2 at 13, Apx. at xx); miscellaneous paperwork addressed to Maurnisha Cobene and Clarence Remble.  (R. 584:  Tr. Vol. 2 at 15, Apx. at xx); a copy of Remble's tax return, (R. 584:  Tr. Vol. 2 at 14 & 30-31, Apx. at xx); over twenty cellular telephones, (R. 584:  Tr. Vol. 2 at 16-18, Apx. at xx); a number of photographs, (R. 584:  Tr. Vol. 2 at 19-20, Apx. at xx); and a computer. (R. 584:  Tr. Vol. 2 at 19, Apx. at xx).  Remble, who was present in the home at the time the search warrant was arrested at the scene.  (R. 584:  Tr. Vol. 2 at 21 & 28-29, Apx. at xx).

24

Law enforcement authorities also conducted other searches at locations in Zanesville and Coshocton, Ohio. During the search in Coshocton, three young men from California were arrested in possession of crack, marijuana, items used to distribute narcotics, and a large amount of U.S. currency. (R. 567: Tr. Vol. 9 at 138-143, Apx. at xx). On July 29, 2005, at a residence on Echo Avenue in Zanesville, officers seized crack, cocaine, a book which identified different radio frequencies of law enforcement agencies nationwide; and numerous items used to package and distribute narcotics and/or currency, including black rubber bands. (R. 566: Tr. Vol. 8 at 130-138, Apx. at xx).

**8.     Remble Moves To Suppress The Evidence Seized At The West Raymond Address**

On November 11, 2005, Remble filed a pro se motion to suppress the evidence seized from 469 West Raymond Street, Compton, California. (R. 222: Mtn. for Suppression Hrg., Apx. at xx). His counsel would later file another motion to suppress the evidence seized from that residence on January 12, 2006. (R. 277: Mtn. to Suppress, Apx. at xx). The government responded to both motions. (R. 336: Response to Motion, Apx. at xx). On February 16, 2006, the district court held a hearing on the motions to suppress. (R. 338: Minute Entry).

25

On February 22, 2006, the district court denied the motions concluding that "[t]here was a substantial basis for the magistrate judge to conclude that probable cause existed to issue [the] search warrant." (R. 339: Order Denying Motion at pp. 10, Apx. at xx). Furthermore, the district court reasoned that, "[e]ven if the warrant was technically insufficient, the exclusionary rule would not prohibit the introduction of evidence obtained pursuant to it." (R. 339: Order Denying Motion, at 10, Apx. at xx).

Remble proceeded to trial on June 6, 2006.

### 9.    The Dots Reveal Remble's Connection

During his trial, fellow co-conspirators Jonathan Cassanova, John Woodward, Joya Caldwell, Jaime Covington, Adonia Hogsten, CJ Roland Martin, Antwain Atkins, and Nicole Adams (who was John Wayne Jones' girlfriend) identified Remble as the person they knew as "The General," "Smoke," and "D-Man" and that they had conspired with him to distribute narcotics, including crack, in Zanesville and Middletown. Although Alexander never met Remble, she testified that Owens talked to him everyday. (R. 564: Tr. Vol. 6 at 7 & 40, Apx. at xx). Also, most witnesses testified that the only thing that they really knew about

him was that he was originally from somewhere in California, had a son named Marquis, was a member of the Dodge City Crips.

Besides the numerous evidentiary items seized by law enforcement officials, the government presented a number of photographs and video images that were either seized directly from the 469 West Raymond Street residence or extracted from the cellular phones that were taken at the time of the search to show he was in fact a co-conspirator.  (R. 568:  Tr. Vol. 10 at 170, Apx. at xx).

During Owens' testimony, the government provided him with photographs marked as government's exhibits 117, 117a, and 117b.  (R. 584:  Tr. Vol. 2 at 184, Apx. at xx).  Government's exhibit 117 was a redacted version of government's exhibit 75e.  (R. 584:  Tr. Vol. 2 at 185, Apx. at xx).   Owens was never shown government's exhibit 75e.  The government then inquired of Owens as to the identity of the individuals shown in government's exhibit 117, to which Owens replied were Remble's son and stepson.  (R. 584:  Tr. Vol. 2 at 188, Apx. at xx).  As to government's exhibit 117a, the government again inquired as to Owens' knowledge of the person shown in the photograph, to which Owens replied that it was a picture of Remble's son.  (R. 584:  Tr. Vol. 2 at 188, Apx. at xx).  Inquiring into further detail, the government asked Owens to describe the clothing that the young man was wearing, to which Owens replied that the young man was wearing

27

a red, black and white throwback athletic jersey. (R. 584: Tr. Vol. 2 at 188-89, Apx. at xx).

Agents Robin Davis, of the FBI, and Agent Lakes identified Government's exhibit 117c as the kitchen scene at 469 West Raymond Street, Compton, California. (R. 584: Tr. Vol. 2 at 19-20 and Tr. 11 at 5-6; Apx. at xx).

Government exhibits 75b, 75c, 75d, and 75e were photographs of young men holding large amounts of U.S. currency. (R. 568: Tr. 10 at 170-71, Ap. at xx; R. 569, Tr. Vol. 11 at 5-9, Apx. at xx). Agent Lakes testified that the place shown in those photographs where the young men were located was the kitchen of the West Raymond Street residence shown in government's exhibit 117c. (R. 569: Tr. Vol. 11 at 5-9, Apx. at xx).

Agent Lakes also testified that photographic and video images were recovered from another cellular telephone seized from the West Raymond location. (R. 568: Tr. Vol. 10 at 127 & 131, Apx. at xx). Government's exhibit 63d was a video extracted from one of the cellular telephones. (R. 569: Tr. Vol. 11 at 131-32, Apx. at xx). After watching the video, Agent Lakes testified that it was Remble on the video as well as the person with whom Owens' recognized as Remble's son in government's exhibit 117a who was wearing what appeared to be the same red, black, and white athletic jersey. (R. 568: Tr. Vol. 10 at 141-42, Apx.

28

at xx).  Agent Lakes also reviewed government's exhibits 63b and 63c and averred

that they were photographs of the same young man on the video with Remble in

government's exhibit 63d.  (R. 568:  Tr. Vol. 10 at 143-44, Apx. at xx).  Agent

Lakes noted that the young man was wearing the same outfit that he had on in the

video and was holding a large amount of U.S. currency which was bound with

black rubber bands.  (R. 568:  Tr. Vol. 10 at 144, Apx. at xx).  Additionally, Agent

Lakes testified that the young man was seated in the in the kitchen of the West

Raymond Street address which was depicted in government's exhibit 117c.  (R.

568:  Tr. Vol. 10 at 145-46, Apx. at xx).

## 10.    Owens' Evasiveness And Tears Cannot Help His Friend

Owens and Remble had known one another for over twenty years and were

"extremely, extremely close."  (R. 584:  Tr. Vol. 2 at 122, Apx. at xx).  When

called by the government to testify, Owens' testimony was adverse, evasive, and

contradictory at times.  (R. 584:  Tr. Vol. 2 at 165, Apx. at xx).  When the

prosecutor questioned Owens about whether "Remble was a drug dealer" or

whether he and Remble split the profits of their dealings, Owens responded with

answers like "you have to be more specific" and "on occasion."  (R. 584:  Tr. Vol.

2 at 120, Apx. at xx).  At other times, Owens flatly contradicted testimony that was

29

provided by people such as Woodward whom testified that he had supposedly met Owens at Remble's direction to receive methamphetamine. For instance, when asked whether Owens knew if Remble dealt methamphetamine, Owens responded that he "did not know." (R. 584: Tr. Vol. 2 at 121, Apx. at xx). When Owens was asked what types of drugs that he knew Remble to deal in, Owens answered, "Just basically cocaine," (R. 584: Tr. Vol. 2 at 121, Apx. at xx). However, this too was inconsistent with his later testimony that Remble would also send him marijuana to distribute, (R. 584: Tr. Vol. 2 at 143-44, Apx. at xx), and the fact that Remble had a key to the Echo Avenue address in Zanesville where law enforcement officers seized crack, cocaine, and methamphetamine. (R. 584: Tr. Vol. 2 at 143, Apx. at xx; R. 567: Tr. Vol. 9 at 12-17, Apx. at xx; and R. 569: Tr. Vol. 11 at 113, Apx. at xx ).

Owens testified that all he had was a customer base for crack and that it was Remble's job to get him the cocaine to process into crack. (R. 584: Tr. Vol. 2 at 129-36, Apx. at xx). Owens testified that the plan was to get rid of the narcotics "as fast as I could" and he and Remble would split the profits 50-50. (R. 584: Tr. Vol. 2 at 136-37, Apx. at xx). Owens would receive over 15 kilos of cocaine from Remble to which he processed into crack for distribution. (R. 584: Tr. Vol. 2 at 133-34, Apx. at xx).

30

Also, Owens testified that he, Remble, and Braggs were friends and that Braggs sold drugs for the organization. (R. 584: Tr. Vol. 2 at 147, Apx. at xx). When Braggs was arrested by Patrolman Pyles, Owens and Remble jointly assisted in getting him a lawyer, bailing him out, and taking care of his drug debt. (R. 584: Tr. Vol. 2 at 149-51, Apx. at xx).

When asked about Richards and Evans, Owens testified that he did not know if they ever took money or drugs anywhere. (R. 584: Tr. Vol. 2 at 160-61, Apx. at xx). When further questioned about the apartment on El Camino Drive in Middletown, Owens testified that he only vaguely remembered it. (R. 584: Tr. Vol. 2 at 161, Apx. at xx). This information contradicted Owens' later acknowledgment that Richards and Evans were two people in which he had admitted under oath that he conspired to distribute narcotics with when he pled guilty. (R. 584: Tr. Vol. 2 at 176, Apx. at xx).

Owens did acknowledge his drug dealings with Alexander and Covington. (R. 584: Tr. Vol. 2 at 163-64, Apx. at xx). However, Owens stated that he was not dealing with Remble at the time that he was dealing with Covington. R. 584: Tr. Vol. 2 at 164, Apx. at xx). This testimony would contradict Owens' testimony that he and Remble discussed Covington as well as Jacory Holt coming to Zanesville. (R. 584: Tr. Vol. 2 at 179, Apx. at xx). Sometime into Owens' testimony, the

31

prosecutor requested a moment to retrieve a Federal Bureau of Investigation Report (commonly known as a "302") and a sidebar was called. During the sidebar, the prosecutor noted Owens' adverse, evasive, and contradictory testimony to the district court judge. (R. 584: Tr. Vol. 2 at 165, Apx. at xx). The Judge even noted Owens' physical change and advised the Court Clerk to get Owens some Kleenex. (R. 584: Tr. Vol. 2 at 165, Apx. at xx).

In the end, Owens admitted that he did conspire with Remble, Alexander, Covington, Anderson, Richards, Evans, Atkins, Jones, Holt, Darnell Mitchell, and others to distribute, among other drugs, crack. (R. 584: Tr. Vol. 2 at 176, Apx. at xx).

## 11.    Conviction and Sentencing

On July 5, 2006, a jury concluded beyond a reasonable doubt that Remble was guilty of conspiracy to possess with intent to distribute in excess of 50 grams of methamphetamine, in excess of 50 grams of cocaine base ("crack"), in excess of 500 grams of cocaine, and an amount of marijuana in violation of Title 21 U.S.C. § 846. (R. 410: Verdict, Apx. at xx). The jury noted their findings in a Special Verdict. (R. 410: Special Verdict at 1-4, Apx. at xx). On July 6, 2006, the jury also determined that Remble's residence located at 469West Raymond Street,

32

Compton, California 90220 should be forfeited to the United States.  (R. 414:

Verdict, Apx. at xx).

On September 18, 2006, the United States Probation Department issued a

PSR indicating that Remble was responsible for the 15 to 18 kilograms of crack

distributed by Owens as well as approximately 1,116.38 grams of

methamphetamine Remble personally distributed to Jeff Remble, Jones, Caldwell,

Richards, Evans, Woodward, Cassanova, and Martin. (PSR at ¶ 77, Apx. at xx).

Converting the narcotics on the drug equivalency table of the Federal Sentencing

Guidelines, the Probation Department determined that Remble was responsible for

approximately 302,232.76 kilograms of marijuana, which corresponds to an

offense level of 38. (Id. at ¶ 78).  Remble received a four point enhancement for his

role as a leader in the conspiracy.  (Id. at ¶ 81).  He also received a two-point

enhancement for obstruction of justice.  (Id. at ¶ 82).  Additionally, the district

court recognized that he received criminal history points for a wide range of

previous convictions, including Conspiracy to Commit Robbery; Robbery;

Possession of Controlled Substance; Unauthorized Possession of a Weapon in a

Courthouse; and Possession of a Firearm by a Convicted Felon.  (Id. at ¶¶ 90, 91,

92, 95, 96).  The PSR noted, and the district court affirmed, that Remble was a

career offender.  (Id. at ¶ 86).

33

On January 18, 2007, after reviewing the motions filed by Remble and the United States, as well as PSR prepared by the United States Probation Office, the district court sentenced Remble to a term of life imprisonment and ordered him to pay a $100,000 fine and serve a five year term of supervised release. (R. 609: Judgment, Apx. at xx).

Previously, on June 21, 2006, the district court sentenced Anderson to a term of 120 months imprisonment and ordered him to pay a $1,000 fine, and serve imposed a five year term of supervised release. (R. 396: Judgment, Apx. at xx).

## SUMMARY OF ARGUMENT

Remble and Owens set up various drug trafficking cells around Ohio. Remble was in charge of getting the narcotics to Owens in Ohio while Owens duty was to return the money, less Owens' cut, back to Remble in California. Remble would recruit new members in California who were willing to distribute narcotics in Ohio and send them out to meet with Owens who would then set them up for distribution. Also, Remble would travel to Ohio to meet with Owens and other members of the organization as well as work to establish narcotics distribution cells in other Ohio cities. If anyone were caught, they were expected to keep their mouth shut.

Eventually, law enforcement authorities connected the dots and sought a search warrant of Remble's residence in California. During the search, officers seized a number of photographs that further connected Remble to the conspiracy. During his trial, individuals testified regarding their relationship with Remble and how they knew he was a member of the Dodge City Crips. The references to the Crips organization allowed them to provide a better understanding of their relationship with Remble as well as their understanding that he was from California. One witness testified that while he was awaiting trial Remble approached him and attempted to bribe him to not testify. This attempt illustrated

Remble's consciousness of guilt.  In the end, Remble was found guilty and, pursuant to the United States Federal Sentencing Guidelines, given an appropriate sentence to reflect his turpitude.

In regards to Caesar Anderson, his sentence is appropriate as the district court did not commit plain error in sentencing him to the mandatory minimum for conspiring to distribute over 50 grams of crack cocaine—the charge to which he pled guilty.  Furthermore, this Court should not address his claim of ineffective assistance of counsel at this time.

## ARGUMENT

**I.    THE DISTRICT COURT PROPERLY DENIED REMBLE'S MOTION TO SUPPRESS BECAUSE THE SEARCH WARRANT AFFIDAVIT CONTAINED SUFFICIENT PROBABLE CAUSE.**

### A.    Standard of Review

The factual findings made by a district court in consideration of a motion to suppress are to be upheld unless they are clearly erroneous.  United States v. Williams, 962 F.2d 1218, 1221 (6th Cir.), cert. denied, 506 U.S. 892 (1992).  The district court's conclusions of law are subject to de novo review on appeal.  Id.

### B.    Sufficiency of Search Warrant Affidavit

Probable cause is to be examined under a "totality of the circumstances" test. Illinois v. Gates, 462 U.S. 213, 238 (1983).  To make a determination based on the totality of the circumstances, the Gates Court opined that:

The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Gates, 462 U.S. at 238.

Remble cites to the cases of Aguilar v. Texas, 378 U.S. 108 (1964) and Nathanson v. United States, 290 U.S. 41 (1933) to support his contention that  the

37

search warrant affidavit lacks probable cause.  He claims that the affidavit is wrought with conclusory statements, opinions not supported by any evidence, and lacks evidence that any of the confidential sources were reliable.  Additionally, Remble argues that the affidavit appears to rely heavily on stale information dating back almost four years before the search warrant.

This case is clearly distinguishable from the facts of <u>Aguilar</u> and <u>Nathanson</u>. The affidavit in <u>Aguilar</u> was scant, indicating only that "[a]ffiants have received reliable information from a credible person and do believe [evidence is] being kept at the [listed] premises...."  <u>See</u> <u>Aguilar</u>, 378 U.S. at 109.  No other evidence was presented to the court.  Likewise, the affiant in <u>Nathanson</u> only averred to the court that he had "cause to suspect and does believe that certain merchandise... is not deposited and contained within the premises [to be searched].  <u>Nathanson</u>, 290 U.S. at 44.

In this case, aside from the agent's failure to indicate in the affidavit that the confidential sources were reliable "in the past," a minor blemish that the district court noted in its opinion denying Remble's motion to suppress, (R. 339, at 8 n.1, Apx. at xx), the affidavit provided by Agent Lakes is replete with information which shows that he had more than a mere affirmance of belief or suspicion when he sought to search the West Raymond Street location.  Moreover, contrary to the

38

Remble's insinuation that all Agent Lakes relied on was the information provided by confidential sources, the affidavit shows that the investigation included a host of investigatory resources, including a number of reliable and credible law enforcement officials.  Also, Agent Peter Lakes attested to having ten years experience in law enforcement with a number of those years being dedicated to investigating narcotics traffickers.

Contrary to Remble's assertion that the information regarding Theopolis Niles was stale, he fails to understand that information one may consider old is relevant in cases of continuous illegal activities.  The district court acknowledged this fact, stating that "[w]hile some of the incidents described in the affidavit preceded the application for the search warrant by as much as four years, staleness of information is not significant where, as in this case, there is evidence of ongoing criminal activity."  (R. 339 at 8, Apx. at xx).  There is no bright-line rule determining staleness of information as Remble would have this Court to believe in his Brief.  Staleness is not determined by some arbitrary time limitation for which facts must be presented to a court, but through an assessment of the facts in their proper context within a particular time period.  See United States v. Canan, 48 F.3d 954, 959 (6th Cir. 1995); United States v. Henson, 848 F.2d 1374, 1382 6th Cir. 1988).  Accordingly, information which demonstrates a chain of related events

concerning a broad span of time continuing to the current period may furnish a most reliable indicia of present activity, thereby clearly demonstrating that probable cause exists.  Henson, 848 F.2d at 1382.

Agent Lakes clearly connected Theopolis Niles' suspicious activities in 2001 to the more recent events in his averments.  Agent Lakes also wove into his averments how Niles, Braggs, and Remble connected since the 2001 time period and how their activities stretched from Zanesville to California.  Even after connecting Niles up, Agent Lakes further detailed the pattern of criminal activities being carried on by Owens, Caldwell, Martin, Covington, and Alexander which all were connected to Remble.

While the information Agent Lakes submitted regarding the confidential sources may not have been seen as sufficient to indicate how they were reliable "in the past," Agent Lakes could accept the confidential source's information as having an indicia of reliability since they both provided not only information regarding the criminal activity of members of the Crips Organization, but also admitted being involved in some of the criminal activities with them.  Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility–sufficient at least to support a finding of probable cause.  United States v. Harris, 403 U.S. 573, 584 (1971).  Additionally, Agent Lakes averred that the

confidential sources of information were not anonymous.  Thus, they could be easily located and prosecuted based on their admissions.  Such statements against their penal interests with the possibility of prosecution rendered them more reliable then the average source.

The information Agent Lakes provided regarding Owens, Braggs, Covington, Anderson, Caldwell, Martin, and Alexander only strengthened the determination that (1) there was a continuous narcotics distribution pipeline between California and Ohio and (2) Remble, Owens, and Maurnisha Cobene were integral parts of that pipeline.  Although Agent Lakes indicated that the West 163rd Street residence was the location that "M. Cobene" and Remble used to receive money orders, he determined through Choicepoint Online that Cobene, a possible unindicted co-conspirator, was listed as residing at 469 West Raymond Street.

Collaborating with FBI Special Agent K.W. Wong, Agent Lakes furthered his investigation into the activities of Remble in California.  Agent Lakes advised that Agent Wong informed him that the West 163rd Street residence appeared to be used as a drug distribution center and that Remble was observed at both the West 163rd and the West Raymond locations.

In the end, Agent Lakes' belief that evidence and fruits of the criminal activity would be found at the West Raymond Street location was reasonable.

Courts have upheld such an assessment based on the officer's investigation,

training, and experience to be reasonable and proper.  See United States v.

Caicedo, 85 F.3d 1184, 1193 (6th Cir. 1996).

Even arguendo that the warrant was somehow deficient the "good-faith"

exception of United States v. Leon, 468 U.S. 897, 905 (1984).  The rationale of

Leon is that the evidence need not be suppressed when it is obtained through

objective good faith reliance on a facially valid warrant even if that warrant is later

found to lack probable cause.  In Leon, the Court reasoned that the good faith

exception to the exclusionary rule should apply because suppressing evidence

would not assist law enforcement officers in making any better assumptions that

they were acting within the law.  Thus, an officer handed a warrant under these

circumstances cannot be expected to second-guess the judgment of the issuing

judge as to his or her finding of probable cause.

Remble's claim that the affidavit is so lacking in an indicia of probable

cause as to render official belief in its existence unreasonable is without merit.

Moreover, the affidavit is not based on conclusory statements and Remble's

attempt to consider it as such evidences his hypertechnical myopic viewpoint.

Accordingly, the principles of Leon also call for a denial of the Remble's motion to

suppress.

II.    **THE DISTRICT COURT PROPERLY ADMITTED THE PHOTOGRAPHS OF THE YOUNG MEN WITH LARGE AMOUNTS OF CURRENCY AT THE WEST RAYMOND STREET RESIDENCE BECAUSE THEY WERE HIGHLY PROBATIVE.**

A.    <u>**Standard of Review**</u>

Evidentiary determinations by a trial court are reviewed for an abuse of discretion.  <u>See</u> <u>United States v. Brown</u>, 367 F.3d 549, 554 (6th Cir. 2004); <u>United States v. Sassanelli</u>, 118 F.3d 495, 498 (6th Cir. 1999)(regarding Rule 403). To find an abuse of discretion, the reviewing court must form "a definite and firm conviction that the trial court committed a clear error of judgment."  <u>United States v. City of Warren</u>, 138 F.3d 1083, 1088 (6th Cir. 1998).

B.    <u>**The District Court Properly Determined that the Photographs Were Probative to the Case.**</u>

Remble argues that the district court erred in allowing the government to display the photographs of the youth holding large amounts of cash while standing in the kitchen at the West Raymond Street residence.  Remble also argues that the district court should not have admitted the video extracted from a cellular phone which was seized from the residence.  Remble's arguments are misplaced and should be rejected.

During the trial, Remble's attorney objected to the admission of the video and photographs, arguing that they were "highly prejudicial"and inflammatory. (R. 571:  Tr. Vol. 12 at 22-23, Apx. at xx).  The government responded, indicating that the video connected Remble at a particular time with his son, who was wearing a distinct outfit, to the photographs of the youth holding a substantial amount of currency that was bundled in the same manner as the currency officers in Zanesville had intercepted as well as connecting him to evidence seized during various searches.  (R. 571:  Tr. Vol. 12 12 at 22-23, Apx. at xx).

Overruling the objection, the district court ruled that the video and photographs were far more probative than prejudicial because they were generated on a phone subscribed to by Remble and there was a clear identification of the location to which Remble had a connection.  (R. 571:  Tr. Vol. 12 at 24, Apx. at xx).  Also, the district court noted that "[t]here's identification of children shown, a good deal of unexplained cash, black rubber bands, which are a connection to the proceeds of drug sales in the Ohio area."  (R. 571:  Tr. Vol. 12 at 24, Apx. at xx).

The district court would overrule another objection by Remble concerning more photographs that were extracted from different cellular telephones registered to him.  In regards to those photographs, the district court stated that the evidence of children in the kitchen area of the West Raymond residence holding large

44

amounts of unexplained cash that was wrapped with the same distinct black rubber bands that had been seized during the investigation were probative to Remble's participation in the conspiracy, or at the very least, the jury could infer his involvement.  (R. 571:  Tr. Vol. 12 at 25-26, Apx. at xx).

Contrary to Remble's claim that the use of the video or photographs extracted from a cellular telephone seized at the West Raymond Street residence were not probative and may have only incensed the emotions of or confused jurors, the video and photographs provided a vital link to show that large amounts of currency (bundled together in black rubber bands that were similar to those seized during search warrants that occurred in Ohio) were, at some time or another, at the West Raymond Street residence and, were more likely than not at the residence during the same time period Remble was there.  Additionally, the video and photographs connected Remble to the conspiracy because they were extracted from a cellular telephone that listed him as the subscriber.  Cf. United States v. Jenkins, 313 F.3d 549, 559-60 (10th Cir. 2002) (finding that the district court properly admitted photographs of defendants and others holding firearms and large amounts of cash in prosecution for drug trafficking and firearms offenses).  Finally, the video and photographs' probative value also came through Owens' testimony and the distinctive clothing of one of the young men.  The district court made this same

45

observation, concluding that they should be admitted "because they are a link in the chain of evidence connecting Mr. Remble or the unexplained cash visible in the other photographs."  (R. 571:  Tr. Vol. 12 at 29, Apx. at xx).

The district court did not abuse its discretion when it denied Remble's objection and its judgment should not be disturbed.

### III.    THE DISTRICT COURT APPROPRIATELY ALLOWED REFERENCES TO THE "DODGE CITY CRIPS" BECAUSE THEY WERE PROBATIVE TO THE INTER-RELATIONSHIPS BETWEEN CONSPIRATORS.

### A.    Standard of Review

Evidentiary determinations by a trial court are reviewed for an abuse of discretion.  See United States v. Brown, 367 F.3d 549, 554 (6th Cir. 2004).

### B.    The District Court Properly Determined that the References to the Dodge City Crips was Appropriate to Show the Inter-Relationships Between Conspirators and Because it Did Not Become the Theme of the Trial.

Remble argues that the district court erred by admitting the references to the Dodge City Crips because such references created an unfair prejudice against him. Particular references to the organization, however, were not presented to prove Remble's guilt by association; rather, the references illustrated the nature and extent of the conspirators' association; how law enforcement from numerous jurisdictions were able to identify the conspirators then coordinate with one another and focus their resources on them; and, essentially bore on whether they conspired.

Though evidence of an individual's association to a group known to be involved in criminal activities could be prejudicial, such evidence should be admitted when it does not become the entire theme of the trial and will clarify the

47

nature and extent of the associations between conspirators.  <u>United States v.</u>

<u>Johnson</u>, 28 F.3d 1487, 1497-98 (8th Cir. 1994).  Moreover, specific and

circumscribed evidence of gang association may be necessary in trial to show 'the

nature and extent of [ a person's] association, which in turn bears on whether

[they] conspired.'"  <u>Id.</u> at 1497 (citing <u>United States v. Sparks</u>, 949 F.2d 1023,

1026 (8th Cir. 1991) and <u>United States v. Lewis</u>, 910 F.2d 1367, 1372 (7th Cir.

1990)(emphasizing that evidence of gang association is necessary to establish a

joint venture between the defendants).

    The testimony and evidence in this case showed that it was more than a

simple conspiracy between a few identifiable individuals.  Moreover, such

testimony served to establish the historical, geographical, and business connections

between Remble and the other conspirators.  This case involved a conspiracy to

distribute crack, methamphetamine, cocaine, and marijuana between the State of

California and throughout several cities in the Southern District of Ohio by a

number of individuals, including Remble – who at one time was not directly

identified; used numerous aliases and monikers for the purpose of concealing his

identity; attempted to conceal his places of residence through the use of various

state drivers licenses and identification cards; and, changed cellular telephones at

will.  In support of the affidavit for the search warrant for 469 West Raymond

Street, Compton, California, Agent Peter Lakes averred that he worked with numerous law enforcement agencies to connect the dots and identify Remble and Owens as the primary perpetrators of the criminal activities in their communities through their affiliation in the Dodge City Crips organization. Also, Agent Lakes noted that the information he received regarding the Dodge City Crips organization being based in Los Angeles, California, assisted him in focusing on Remble and Owens. Thus, the information surrounding the Crips organization assisted him in identifying Remble, his cohorts, and the true geographical origin of his operations. Even still such evidence did not become the theme of the trial.

Remble argues that the evidence should have been excluded because many of the conspirators were not members of the Dodge City Crips organization and that Remble was said to have left the group. This argument is misplaced. The fact that many of the conspirators were not members of the organization was more reason to include such evidence because it assisted the jury in explaining the nature and extent of the relationships between some of the conspirators. For instance, the evidence explained how Remble and Jeff Remble used the organization to seduce Richards into buying into the illegal activities of the conspiracy.[1] Furthermore, the

---

[1]In <u>Johnson</u>, the Court noted that the witness testified regarding the fact that two fellow conspirators were "Bloods" and two other conspirators were Crips in its conclusion that the testimony was probative to explain the nature of the conspirator's

49

fact that many conspirators, such as Woodward, Caldwell, Lawson, and Jones, were not members of the organization only strengthened the point that the "gang theme" could not become the overarching theme of the trial.

The district court understood that the references made to Remble's association with the Dodge City Crips and the operation base of the organization served only to: (1) clarify the nature and extent of the relationships between him and the other co-conspirators; (2) pinpoint a geographical understanding of the true location of Remble based on the testimony of other conspirators' residences; and (3) assist the jury in understanding the testimony from law enforcement officers from various jurisdictions who, while investigating illegal narcotics activities in their respective locales, indicated that they came to understand that they were dealing with the same individuals.[2]  There did not need to be an indication that Remble's gang membership was a direct cause or reason for the conspiracy for the evidence to be probative.  This case involved a drug conspiracy and, like any other drug conspiracy, references for identification purposes or to show the relationships and associations between co-conspirators was probative.  Certainly, the district

relationships to one another.  See Johnson, 28 F.3d at 1497 n.13.

[2]At trial, the government also indicated that it would not introduce a photograph of the child displaying gang symbols because the photographs had no bearing on the conspiracy.  (R. 584:  Tr. Vol. 1 at 126, Apx. at xx).

court was prepared to address the situation if the government's gang evidence turned into the "theme" of the case.  Contrary to Remble's contention, the "gang theme" never reared its head.  For the reasons stated, the judgment of the district court's determination on the issue should be upheld.


### IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING ATKINS TO TESTIFY THAT REMBLE APPROACHED HIM WHILE THEY WERE INCARCERATED AND ATTEMPTED TO BRIBE HIM TO NOT TESTIFY.

#### A.   Standard of Review

Evidentiary determinations by a trial court are reviewed for an abuse of discretion.  See General Elec. Co. v. Joiner, 522 U.S. 136, 141 (1997).

#### B.   The District Court Properly Determined that Atkins' Testimony Regarding Remble's Attempt to Bribe Him to Not Testify Because it was Probative of "Consciousness of Guilt."

During the trial, the government informed the district court that it would be calling Atkins as a witness and indicated that Atkins would testify to not only his drug relationship with Remble, but also the fact that Remble had been trying to bribe him to not testify while they were housed together and awaiting Remble's trial.  (R. 585:  Tr. Vol. 4 at 26, Apx. at xx).  Remble's defense counsel objected to this testimony.  (R. 585:  Tr. Vol. 4 at 28, Apx. at xx).  Overruling the objection,

the district court stated that, if the testimony was as the government represented, the law favored its admission as "consciousness of guilt."  (R. 585:  Tr. Vol. 4 at 29, Apx. at xx).

During his testimony, Atkins averred that although he and Remble were being housed together at a jail in Kentucky, he attempted to stay away from Remble.  (R. 426: 6/12/06  Tr. at 21, Apx. at xx).  However, Atkins testified that Remble would pull him to the side to discuss the case and tell him "just don't testify against him and everything will be taken care of."  (R. 426: 6/12/06  Tr. at 24, Apx. at xx).  Atkins related that he knew this meant that Remble would put money on his books while Atkins was incarcerated.  (R. 426: 6/12/06  Tr. at 24, Apx. at xx).

While Rule 404(b) of the Federal Rules of Criminal Procedure forbids the admission of evidence of other crimes or bad acts when offered to prove the character of the person in order to show he acted in conformity therewith, <u>see</u> Rule Fed. R. Crim. P. 404(b), the district court was correct that the law favors the admission of spoilation evidence, which includes evidence that a defendant attempted to bribe and/or threaten a witness, to show "consciousness of guilt." <u>United States v. Mendez-Ortiz</u>, 810 F.2d 76, 76 (6th Cir. 1986)(citations omitted). Remble acknowledges this legal tenet in his own brief citing <u>United States v.</u>

Franks, 511 F.2d 25, 36 (6th Cir. 1975), however, he attempts to create an aura of unfair prejudice by focusing on the place – church meetings – in which Atkins testified Remble approached him rather than the attempted act of bribery which the precept is concerned.  Then Remble makes a major leap that the jury would then have made impermissible inferences about his character because of that location. The government did not question Atkins on the church-like meetings to bring some sort of religious context to Remble's acts.  Furthermore, if we were to accept Remble's assertion that the location where the act occurred weighs more heavy on the issue consciousness of guilt than the act of bribery itself, then we could assume that Remble's attendance at church meetings long before Atkins tilted the scale in Remble's favor because the jury could infer that the location was one in which he was asking Atkins to tell the truth – "that Remble had actually not engaged in this conspiracy."

This case is on all fours with Mendez-Ortiz, supra, in that the contested testimony was that the defendant and the witness were locked up together and, during that time, the defendant told the witness "Don't mess with us" and offered the witness monetary gain if he did not testify.  Mendez-Ortiz, 810 F.2d at 78.  In Mendez-Ortiz, the Court held that the testimony in question was not inflammatory and presented little danger of unfair prejudice.  Id. at 79.  Moreover, the Court

determined that the testimony was highly probative.  Atkins' testimony in this case mirrored that of the witness in  Mendez-Ortiz and it too was highly probative to Remble's consciousness of guilt.

Even assuming that this Court determined that the district court did abuse its discretion by admitting the evidence of Remble's bribe, his substantial rights were not affected because there was overwhelming evidence linking him to the drug conspiracy.  An abuse of discretion that does not affect substantial rights is harmless error and should be disregarded. United States v. Bonds, 12 F.3d 540, 554 (6th Cir. 1993); United States v. Marquina, 172 F.3d 874, 1999 WL 55281, at *1, *3 (Jan. 12, 1999)(citing Mendez-Ortiz and Bonds).

This Court should reject Remble's assertion that the District Court abused its discretion to admit Atkins' testimony of his bribe.

## V.    THE DISTRICT COURT'S SENTENCE OF REMBLE WAS REASONABLE.

The district court recognized that Remble's criminal history was replete with convictions which included Conspiracy to Commit Robbery; Robbery; Possession of Controlled Substance; Unauthorized Possession of a Weapon in a Courthouse;

and Possession of a Firearm by a Convicted Felon. (PSR at ¶¶ 90, 91, 92, 95, 96). The district court concluded that Remble's criminal history score was properly calculated by the Probation Officer and deemed him a career offender. (R. 638: Sentencing Tr. at 32; Apx. at xx).

Remble was sentenced to life term of imprisonment. (Id. at 34; Apx. at xx). The district court also sentenced Remble to 5 years of supervised release and fines totaling $100,000. (Id. at 34-35; Apx. at xx).

A review of the transcript of the sentencing hearing indicates that the district judge considered the PSR, addressed and resolved all of counsel's concerns, and heard arguments in mitigation of sentence from the defense counsel. In announcing the sentence, that district court judge indicated that she had taken the pertinent 18 U.S.C. § 3553(a) factors into account. (Id. at 37; Apx. at xx).

First, the district court properly reasoned that Remble was responsible for the amount crack cocaine distributed by Owens and others, opining:

> I think the primary argument is that the amount of cocaine attributed to Mr. Remble, sold by his codefendant, Earl Owens, should not be counted. But Mr. Owens' testimony that he was not aware – Mr. Remble was not aware that Owens was selling crack is not credible. And there's other evidence that Mr. Remble knew that Owens was selling crack in Zanesville. In particular, Antwain Atkins bought crack directly from Mr. Remble in Zanesville in the Southern District of Ohio,. . . . And Jaime Covington testified that Remble

55

had told him that Ohio, and in particular Zanesville, was
a good place to make money – selling crack. . . .

I think it's more likely so than not that Mr. Remble is
responsible for Owens' sales of at least 15 kilograms of
crack.  And the base offense level for 1.5 or more
kilograms of cocaine base is 38.  But there's enough
cocaine, just powder cocaine in this matter, to put Mr.
Remble's offense level at 38.

He's also been held accountable in the presentence report
for 1,116.38 grams of methamphetamine. . . . So, I think
the Probation Officer was correct in calculating that
amount of methamphetamine.  And the marijuana
equivalent of these two drugs is 302,232.73 kilograms.
And the break point for level 38 is actually 30,000
kilograms of marijuana, so to say that Mr. Remble is well
in excess of that level is an understatement. . . .

Mr. Remble's responsible for his own acts as well as all
those that are reasonably foreseeable on the part of others
who are involved in this conspiracy.

(Id. at 23-26; Apx. at xx).  Although Remble maintains that the calculations

reached by the Probation Officer in  Paragraph 78 of the PSR were based on an

amounts of crack and cocaine not testified to at trial, this is merely an incredible

attempt to divorce himself from the distribution activities of Owens' and others.

Remble and Owens were partners 50/50... in profits, debts, liabilities, and

culpability.  Simply put, they "claimed the lion's share of the proceeds from the

conspiracy."  (Id. at 26-27; Apx. at xx).

56

Also, the district court properly recognized that <u>United States v. Streat</u>, 22 F.3d 109 (6th Cir. 1994) was not applicable in this case because the issue in Remble's case was "recency" of his sentences not whether points should be counted. (<u>Id.</u> at 31-32; Apx. at xx). The district court's denial of Remble's motion that his criminal history was overstated was proper.

For the reasons stated, this Court should deny Remble's fifth claim in his Brief and the district court's sentence should not be disturbed.

## VI.   THE DISTRICT COURT DID NOT PLAINLY ERR IN SENTENCING ANDERSON TO THE MANDATORY MINIMUM PENALTY FOR VIOLATING 21 U.S.C. §§ 846 AND 841(b)(1)(A).

After accepting Anderson's guilty plea to violating 21 U.S.C. §§ 846 & 841(b)(1)(A), the district court sentenced him to the mandatory minimum 10-year term prescribed by those statutes. (R. 310, Plea Agreement; Apx. xx; R. 396, Judgment; Apx. xx.) Anderson argues on appeal that the mandatory minimum penalty was not applicable to him. Because Anderson did not raise this claim when the district court invited objections at the sentencing hearing's conclusion (6/21/06 Tr. at 10; Apx. xx), the standard of review is "plain error." <u>United States v. Vonner</u>, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). That standard requires

Anderson to show (1) an error that (2) is obvious, (3) affected his substantial

rights, and (4) seriously affected the fairness of the proceedings.  Id.

The 10-year sentence is valid.  Anderson pled guilty to conspiring to possess

with the intent to distribute over 50 grams of crack, plus other drugs, in violation of

21 U.S.C. §§ 846 & 841(b)(1)(A).  Those statutes mandate that "such person shall

be sentenced to a term of imprisonment which may not be less than 10 years."  21

U.S.C. § 841(b)(1)(A).  Imposition of the 10-year term was therefore proper.

Relying principally on United States v. Colon-Solis, 354 F.3d 101 (1st Cir.

2005), Anderson argues that the mandatory minimum was inapplicable because he

and the government stipulated that his base offense level under the Federal

Sentencing Guidelines would be 28.  In Colon-Solis, the First Circuit held that

although the statutory maximum "in a drug conspiracy case" is determined "from a

conspiracy-wide perspective," to "apply the mandatory minimum to a particular

coconspirator, the sentencing court must make a specific finding, supportable by a

preponderance of the evidence, ascribing the triggering amount to that

coconspirator."  Id. at 103.  Anderson argues that since offense level 28

corresponds to 20-35 grams of crack, U.S.S.G. § 2D1.1 (2005 ed.), the mandatory

minimum should not have been applied to him.  The Court should reject this

argument not only because <u>Colon-Solis</u> is wrong, but also because Anderson's case is distinguishable from <u>Colon-Solis</u> in several respects.

This Court should not follow the First Circuit's decision in <u>Colon-Solis</u> because its reasoning is incorrect. The statutory language is clear. A violation of 21 U.S.C. § 846 carries the same "penalties as those prescribed for the offense, the commission of which was the object of the...conspiracy," and where the object is possession with the intent to distribute 50 grams or more of cocaine base, "such person shall be sentenced to a term of imprisonment which may not be less than 10 years," <u>id.</u> § 841(b)(1)(A).

The <u>Colon-Solis</u> decision effectively amends the statutory text to provide that "such person shall be sentenced to a term of imprisonment which may not be less than 10 years, if and only if that the district court makes a specific finding, supportable by a preponderance of the evidence, ascribing the triggering amount to that coconspirator." But <u>Colon-Solis</u> does not explain how the statute could permissibly be interpreted in this manner. Such statutory amendment is for Congress alone. <u>E.g.,</u> <u>United States v. Jones</u>, 542 F.2d 661, 673 (6th Cir. 1976) ("It is not for this Court to question the wisdom of Congress and to establish an implied exception to a federal statute by judicial fiat.").

59

Nor does it comport with principles of statutory interpretation to hold that the quantity of drugs triggers the statutory maximum but not the minimum, where the statute prescribes both together from the same trigger.  Rather, "when Congress uses the same language in two different places in the same statute, the words are usually read to mean the same thing in both places."  <u>Freeman v. Francis</u>, 196 F.3d 641, 643 (6th Cir. 1999).  <u>Accord</u> <u>Clark v. Martinez</u>, 543 U.S. 371, 378 (2005).

The cases that <u>Colon-Solis</u> relied upon in support of its novel rule, including this Court's decision in <u>United States v. Swiney</u>, 203 F.3d 397 (6th Cir. 2000), do not support it.  All were cases before <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and in all, the defendants were convicted of violating 21 U.S.C. §§ 846 and 841(a)—not any section of § 841(b), which was treated as a sentencing penalty provision at that time.  <u>See, e.g.</u>, <u>United States v. Jinadu</u>, 98 F.3d 239 (6th Cir. 1996) ("It is well settled law that the determination of the quantity of drugs involved is not an element of the offense charged.").  Given mandatory Guidelines and an undifferentiated § 841(a) conviction, judicial fact finding was required to fix the applicable penalty under both § 841(b) and the mandatory Guidelines.

Where, however, a defendant has been convicted of violating a subsection of § 841(b) (and its elements proved to the jury or admitted), the statutory penalties of § 841(b) necessarily control.  <u>See</u> <u>United States v. Gibney</u>, 519 F.3d 301, 304-05

60

Case: 07-3106    Document: 39    Filed: 06/24/2008    Page: 67

(6th Cir. 2008).  Cases like <u>Swiney</u> and <u>Jinadu</u>, which did not consider convictions under § 841(b), are therefore inapposite, and the First Circuit erred in relying on these precedents.  No court outside the First Circuit has followed <u>Colon-Solis</u>, and this Court should decline Anderson's invitation to do so.

Anderson could not prevail even if <u>Colon-Solis</u> were the law of this circuit because his case is distinguishable in at least two key respects.  First, the defendant's "straight guilty plea" in <u>Colon-Solis</u> admitted only that "the conspiracy had handled" the triggering quantity; the defendant's own responsibility was "left open."  354 F.3d at 102.  In contrast, Anderson admitted more than that the conspiracy generally involved more than 50 grams of crack: "Anderson admits that he conspired with a number of individuals in distributing in excess of 50 grams of cocaine base and other narcotics in the Southern District of Ohio and elsewhere." (R. 437: 1/18/06 Tr. at 31; Apx. xx.)  Anderson's admission that he himself conspired to distribute the triggering amount obviates the need for any further fact-finding under the rule of <u>Colon-Solis</u>.  <u>See</u> <u>United States v. Ortiz-Torres</u>, 449 F.3d 61, 73 (1st Cir. 2006) (distinguishing <u>Colon-Solis</u> where attributable amount not left open by defendant's admissions).

Anderson's argument under <u>Colon-Solis</u> also fails because he himself sold more than 50 grams of crack, as the presentence report found and as no one

61

disputed.  (PSR ¶ 60; Apx. xx; 6/21/06 Tr. at 3; Apx. xx.)  Under any measure of

coconspirator responsibility, therefore, the triggering amount of crack is properly

ascribed to Anderson personally.  True, by stipulation, he was held accountable for

only 20-35 grams for purposes of the Guideline computation (PSR ¶¶ 26, 103;

Apx. xx, xx), but the lesser amount owed to the probation officer's application of §

1B1.8 of the Guidelines (PSR ¶ 26; Apx. xx; see also 1/18/06 Tr. at 12; Apx. xx).

That section excludes from consideration in determining the Guideline range self-

incriminating information revealed by a defendant in the course of providing

information to the government about the unlawful activities of others.  U.S.S.G.

§ 1B1.8(a).  Arguably, the probation officer should not have applied the section at

all, since Anderson refused to provide information about others.  (See R. 437:

1/18/06 Tr. at 13; Apx. xx; R. 565: 6/21/06 Tr. at 7-8; Apx. xx).  But in any event,

§ 1B1.8 by its terms concerns only the determination of the applicable Guideline

range.  It is no restriction on what information may be used to determine the

applicable statutory minimum.  Even under Colon-Solis, therefore, the mandatory

minimum was properly applied to Anderson.

    Finally, Anderson cannot satisfy two other prongs of the "plain error" test.

First, if there was any error in applying the mandatory minimum to Anderson (and

there was not), it surely is not obvious.  See United States v. Blackwell, 459 F.3d

739, 772 (6th Cir. 2006) ("At a minimum, the Ninth Circuit's decision indicates that reasonable minds could differ as to the legality of the disputed condition, and any error was therefore not 'plain.' We therefore affirm the district court's imposition of the disputed term."), cert. denied, 127 S. Ct. 1336 (2007). Second, application of the mandatory minimum did not harm the fairness, integrity, or public reputation of the proceedings. Anderson's plea agreement specifies the 10-year minimum. (R. 310, Plea Agreement p. 2; Apx. xx.) The minimum was discussed several times during his change-of-plea hearing, including mention of the fact that the statute would bind him regardless of the Guideline offense level. (E.g., R. 437: 1/18/06 Tr. at 9, 13; Apx. xx.) Under these circumstances, the Court should not exercise its discretion to notice the forfeited error, even if it determines that the other parts of the "plain error" test have been met.

## VII.  THE COURT SHOULD DECLINE TO ADDRESS ANDERSON'S INEFFECTIVE-ASSISTANCE CLAIM ON DIRECT APPEAL.

This Court usually declines to address ineffective-assistance claims on direct appeal, preferring to channel such claims into § 2255 proceedings. E.g., United States v. Gonzalez, 501 F.3d 630, 644 (6th Cir. 2007). That is the proper course here with respect to Anderson's claim that his lawyer was ineffective for failing to object to the mandatory minimum sentence that he received. The present record

lacks development regarding counsel's strategic choices. There were no motions or hearings below regarding it. Therefore, the present record is not sufficiently developed to assess Anderson's claim.

In the government's view, Anderson's trial counsel was effective. He negotiated a very favorable plea agreement for Anderson and secured not only the opportunity for Anderson to provide substantial assistance (and thereby earn a motion under 18 U.S.C. § 3553(e) that would eliminate the statutory minimum), but also a low stipulated Guideline range, which would be applicable in the event that a § 3553(e) were filed and granted. Anderson himself chose not to cooperate. Nor was the lawyer professionally incompetent for failing to object to the mandatory minimum because, as explained in the preceding section, such an objection would lack merit.

## CONCLUSION

Based upon the foregoing, the convictions and sentences of Clarence Remble and Caesar Anderson should be affirmed.

Respectfully submitted,

GREGORY G. LOCKHART
United States Attorney

64

s/Kenneth L. Parker
_____
KENNETH L. PARKER (0068805)
Assistant United States Attorney
220 Potter Stewart U.S. Courthouse
100 East Fifth Street
Cincinnati, Ohio  45202
(513) 684-3711

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that one copy of the foregoing was filed electronically on this 24th day of June,  2008, providing electronic service to: Wende C. Cross (Attorney for Clarence Remble), 3460 Reading Road, Cincinnati, Ohio 45229, and Andrew P. Avellano (Attorney for Caesar Anderson), 4181 East Main Street, Columbus, Ohio 43213.

s/Kenneth L. Parker
KENNETH L. PARKER (0068805)
Assistant United States Attorney

66

# <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that this brief complies with the length limitations of Fed. R. App. P. 32(a)(7) in that this principal brief contains 13,960 words. This certification is based upon the word count program of the word processing system used in preparation of this brief and is filed pursuant to Fed. R. App. P. 32(a)(7)(c)(i).

Respectfully submitted,

GREGORY G. LOCKHART
United States Attorney


s/Kenneth L. Parker
KENNETH L. PARKER (0068805)
Assistant United States Attorney
220 Potter Stewart U.S. Courthouse
100 East Fifth Street
Cincinnati, Ohio 45202
(513) 684-3711

## APPELLEE'S CROSS-DESIGNATION OF APPENDIX CONTENTS

The United States, pursuant to Sixth Circuit Rule 30(b), hereby designates

the following filings in the district court's record as items to be included in the

Joint Appendix:

## DOCUMENTS

Docket Sheet: United States v. Clarence Remble (1:05-CR-113(1)):

| DESCRIPTION OF ENTRY | DATE | RECORD ENTRY NO. |
|---|---|---|
| Motion for Suppression Hearing | 11/2/05 | R. 222 |
| Motion to Suppress | 1/12/06 | R. 277 |
| Response to Motion | 2/8/06 | R. 336 |
| Response to Motion - Exhibit 1 | 2/8/06 | R. 336-2 |
| Minute Entry: Motions Hrg. | 2/16/06 | R. 338 |
| Order Denying Motion | 2/22/06 | R. 339 |
| Jury Verdict | 7/5/06 | R. 410 |
| Jury Verdict (Forfeiture) | 7/6/06 | R. 414 |
| Judgment | 1/19/07 | R. 609 |
| Notice of Appeal | 1/19/07 | R. 611 |
| Final Pre-Sentence Report | | |

Docket Sheet: United States v. Caesar Anderson (1:05-CR-113(4)):

| DESCRIPTION OF ENTRY | DATE | RECORD ENTRY NO. |
|---|---|---|
| Plea Agreement | 1/18/06 | R. 310 |
| Judgment | 6/22/06 | R. 396 |
| Notice of Appeal | 6/22/06 | R. 399 |
| Final Pre-Sentence Report | | |

## **TRANSCRIPTS**

| TRANSCRIPT REFERENCES | PAGE NO. AND VOLUME | RECORD ENTRY NO. |
|---|---|---|
| Change of Plea (Anderson) (1/18/06) | pp. 31 | R. 437 |
| Trial Transcript - Vol. 1 | pp. 126 | R. 583 |
| Trial Transcript - Vol. 2 | pp. 1-115; 120-190 | R. 584 |
| Trial Transcript - Vol. 4 | pp. 6-16; 25-44; 70-110 | R. 585 |
| Trial Transcript - Vol. 6 | pp. 5-20; 40-60; 70-105; 136-155 | R. 564 |
| Trial Transcript - Vol. 7 | pp. 70-88; 130-185 | R. 565 |
| Trial Transcript - Vol. 8 | pp. 55-80, 125-140 | R. 566 |
| Trial Transcript - Vol. 9 | pp. 10-35; 70-150 | R. 567 |
| Trial Transcript - Vol. 10 | pp. 120-150; 170 | R. 568 |
| Trial Transcript - Vol. 11 | pp. 5-10; 110-135 | R. 569 |
| Trial Transcript - Vol. 12 | pp. 20-30 | R. 571 |
| Trial Transcript Excerpt (Fourth Day - 6/12/06) | pp. 5-26, 42-69 | R. 426 |
| Trial Transcript | pp. 10 | R. 394 |